653 So.2d 232 (1995)
Jeffrey TAYLOR, Sr., Jeffrey Taylor, Jr., Shirley Taylor Giles, Rosie Taylor Lewis, Frank Taylor, Gladys Taylor David, Genner Taylor, Ruthie Taylor, Lamar Taylor, Kenneth Taylor, Howard Taylor, and Charles Taylor, Plaintiffs-Appellants,
v.
The CITY OF SHREVEPORT; Charles Gruber, Chief of Police, Shreveport, Louisiana; W.N. Roscoe; R.P. Lopez; B.W. Strange; and W.H. Bobbitt; Individually and in Their Respective Official Capacities, Defendants-Appellees.
No. 26,820-CA.
Court of Appeal of Louisiana, Second Circuit.
April 7, 1995.
*234 S.P. Davis, Shreveport, for appellants.
Jerald N. Jones, City Atty., City of Shreveport by John M. Frazier, Shreveport, for appellee.
Before SEXTON, BROWN and WILLIAMS, JJ.
SEXTON, Judge.
In this wrongful death and survival action filed by Jeffrey Taylor, Sr., husband of decedent, Ruthie Taylor, and their eleven children against the city of Shreveport, the Shreveport Police Chief, Charles Gruber, W.N. Roscoe, R.P. Lopez, B.W. Strange, and W.H. Bobbitt, individually, and in their respective official capacities, the trial court denied all claims of plaintiffs at their cost and they appeal. We affirm.
Damages were sought for the wrongful death of Mrs. Taylor, for violation of her *235 constitutional rights, privileges and immunities, including punitive damages, attorney fees, survival damages in the form of mental anguish, distress pain and suffering, grief, loss of love and affection, funeral expenses, economic loss, and past and future loss of enjoyment pursuant to the provisions of LSA-C.C. Arts. 2315, 2315.1 and 2315.2 and 42 U.S.C.A. § 1983.
Defendants pled the affirmative defenses of qualified immunity, immunity, and the public duty doctrine.

FACTS
On March 23, 1989, the day of the incident, Mrs. Taylor was at home with several of her eleven children. The family lived in Cedar Grove. There was a vacant lot across the street from the home, which allegedly was known as a location for drug activity.
On the day prior to the incident in question, March 23, 1989, Officer Lopez saw what he believed to be a drug transaction occurring in the vacant lot across the street from the Taylor house. As he recognized some of the Taylor children's involvement, Lopez later went to the home of Ruthie Taylor to speak with her. The conversation was volatile. The next day, at the intersection of 73rd Street and Fairfield, Officers Bobbitt, Strange and Roscoe, while running a "corner check," saw a group of individuals gathered near the vacant lot. Officer Bobbitt began speaking with Dexter Samuels who began walking quickly away with his hands in his pockets. Officers Strange and Roscoe were in a separate car and requested that Samuels return to their vehicle. Samuels refused and commented that "they wanted no part of him." Officer Strange requested that Officer Roscoe not let Samuels out of his sight. At that point, Samuels began running from them. Samuels ran toward the Taylor home with the officers on his heels. The officers entered the Taylor home, without a warrant, following Samuels, who allegedly went into the bathroom of the house. As Officer Roscoe entered the home, Samuels exited the bathroom and ran into Officer Roscoe, who apprehended him. Officer Strange entered the house directly behind Officer Roscoe and secured from the commode four individual sandwich bags containing a green leafy substance appearing to be marijuana. Samuels was removed from the house.
Mrs. Taylor was escorted outside of the house by her daughter where a large crowd had evidently gathered. Mrs. Taylor had a prior heart attack in 1980 and was advised by her physician to avoid loud noises, stressful situations, and heavy work. It appears that soon after the officers left, Mrs. Taylor, 57 years old, collapsed. Officers Bartlett and Bobbitt returned to the house after being informed by police radio that someone at the Taylor house needed medical assistance (they had initially been called for backup, but had left the violent scene after bottles were thrown). They were invited in. Officer Bartlett advised that he knew CPR, but was threatened with bodily harm if Mrs. Taylor was touched. Officers Bartlett and Bobbitt then left again. Emergency medical technicians later arrived, and Mrs. Taylor was transported to the hospital where she, after never regaining consciousness, died five days later.
Dexter Samuels was charged with possession of marijuana with intent to distribute and later entered a plea of guilty to possession of marijuana.
As a result of these circumstances, plaintiff and his children filed suit. In denying the claims of plaintiffs, the trial judge found the arrest valid, but also noted that plaintiffs were estopped from questioning the validity of the arrest in light of the guilty plea of Samuels. The court concluded that the city of Shreveport was not liable under 42 U.S.C.A. § 1983 under the doctrine of respondeat superior because of jurisprudence holding that no such liability exists. Next, the court addressed the issue of the individual liability of the police officers under those provisions. The court found that there were no allegations of any participation of Chief Gruber in these activities and there was no evidence of "policy, custom or habit" involving Gruber which could be said to violate 42 U.S.C.A. § 1983. The court came to the same conclusion as it related to the individual police officers. Further, the court found that the officers enjoyed qualified immunity because *236 their conduct did not violate a "clearly established statutory or constitutional principle which a reasonable person would have known."
Relevant to the Louisiana tort claim, the court found that the officers owed no duty to Mrs. Taylor, the scope of which would have extended to the officers not to enter her home in pursuit of criminals in an attempt to enforce the law. The court determined that there was no evidence that her death was foreseeable. The judge also determined that the public duty doctrine of LSA-R.S. 9:2798.1 applied to the officers, thus protecting them from liability under these circumstances.
Plaintiffs appeal, arguing that there existed no reasonable basis for the trial court dismissal of plaintiffs claims and the denial of damages to the heirs of Mrs. Ruthie Taylor. Plaintiffs next argue that the trial court erred in finding that probable cause existed for the arrest of Dexter Samuels. Further, plaintiffs argue that the trial court erred in finding that the doctrines of public duty and qualified immunity protected defendants from liability under these circumstances.

LIABILITY UNDER 42 U.S.C.A. § 1983
We first address the issue of the liability of the city of Shreveport through the doctrine of respondeat superior under the provisions of 42 U.S.C.A. § 1983. In Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court of the United States specifically held that a municipality may not be held liable solely under the doctrine of respondeat superior. However, a municipality may be held liable if a policy, custom or practice is found as an independent basis for liability. Leatherman v. Tarrant County Narcotics Unit, ___ U.S. ___, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); Monell, supra. Further, the policy must be established by a showing that the municipality's decision maker with final authority regarding the policy had issued a proclamation, policy or edict or that a custom was established through a course of conduct by the practices of municipal officials which are so permanent or well-established so as to virtually constitute law. Barcume v. City of Flint, 819 F.Supp. 631 (E.D.Mich.1993).
In this case, plaintiffs specifically plead liability of the city of Shreveport based upon the doctrine of respondeat superior. However, under Monell, supra, there can be no valid claim against the city of Shreveport based upon this legal doctrine. Additionally, our review of the record before us reveals no allegations or proof relevant to policy, custom or practice as an independent basis for liability of the city of Shreveport. In order for municipal liability to exist under the provisions of 42 U.S.C.A. § 1983, there must exist an affirmative link between the municipal policy and the alleged constitutional violation. The proof of a single act of unconstitutional activity is not sufficient unless proof of the incident also included proof that it was caused by an existing municipal policy. Sivard v. Pulaski County, 17 F.3d 185 (7th Cir.1994). This case contains no such allegation or evidence.
Next, we address the liability of the chief of police. The trial court determined that "[t]he petition fails to allege any conduct of involvement of former Chief of Police Charles Gruber. Furthermore, there was no evidence whatsoever as to any action or inaction of Mr. Gruber, nor any policy, custom, or habit involving him or the Shreveport Police Department which might arguably violate § 1983."
An official's liability under 42 U.S.C.A. § 1983 may not be based upon the doctrine of respondeat superior. Thompson v. Bass, 616 F.2d 1259 (5th Cir.1980), cert. denied, 449 U.S. 983, 101 S.Ct. 399, 66 L.Ed.2d 245 (1980). Supervisory officers' liability will not lie for failure to prevent police misconduct, absent a showing of direct responsibility for the improper action and a causal connection between the misconduct and the official sued. Harris v. Pirch, 677 F.2d 681 (8th Cir.1982). This direct responsibility includes actual or constructive knowledge, an inadequate response on the part of the supervisor so as to show deliberate indifference, or a tacit authorization of the alleged offensive practices by the supervisory officer. Shaw v. Stroud, 13 F.3d 791 (4th Cir.1994), *237 cert. denied, ___ U.S. ___, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994).
In this case, no allegations are contained in the pleadings relevant to the basis of alleged liability of Chief Gruber. The law is clear that his liability cannot lie under the doctrine of respondeat superior, nor does the record before us contains any evidence whatsoever relating direct responsibility or knowledge of the alleged constitutional violation.
Finally, we address the liability of the individual police officers under the provisions of 42 U.S.C.A. § 1983. The affirmative defense of qualified immunity from suit is available to all government officials, including police officers, in § 1983 actions. England v. Hendricks, 880 F.2d 281 (10th Cir.1989), cert. denied, 493 U.S. 1078, 110 S.Ct. 1130, 107 L.Ed.2d 1036 (1990). The burden of proof of qualified immunity lies with the official asserting it. Houghton v. South, 965 F.2d 1532 (9th Cir.1992). A public official is entitled to be shielded from liability for civil damages under the provisions of 42 U.S.C.A. § 1983 insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Procunier v. Naverette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).
In this case, plaintiffs assert that the police officers violated their civil rights based upon a lack of probable cause to arrest Dexter Samuels. They argue in brief that the officers were not justified in entering the home of Ruthie Taylor in light of the circumstances surrounding the arrest of Samuels. Those circumstances, as revealed at trial, are as follows. Corporal William Bobbitt arrived in the general area of the Taylor home on March 24, 1989. He had been employed by the Shreveport Police Department approximately nine years at the time of his testimony. He was a patrol officer assigned to the Cedar Grove area. He testified that upon orders of his superiors, he and three other officers, Strange, Lopez and Roscoe, approached the corners of 73rd and Fairfield streets for the purpose of a "corner drug check." He noted that on the day in question he had not received any complaints of drug dealing in the area, but that he had received numerous complaints in the past and had, in fact, recovered narcotics and observed illegal activity in the area.
He testified that when he arrived at the scene, he saw a group of black individuals standing next to the street. He admitted that he did not observe any drug activity occurring among these individuals. The officer noted that he attempted to detain Mr. Samuels in order to get information for a field interview card. At that time, Samuels walked past the officer. Bobbitt anticipated that the other officers would intercept Samuels for the purpose of obtaining the needed information. Bobbitt noted that Samuels' hands remained in his pockets during the time that he observed him. He admitted that he did not see Samuels transfer anything to another individual. As the officers approached the group, Samuels made a move to exit the gathering and began walking toward the Taylor residence. Bobbitt was confident at that point that the other officers would deal with Samuels but heard a noise behind him. When he turned around, he saw the other officers in pursuit of Samuels who had begun to run toward the Taylor home. He then joined in the pursuit of Samuels.
All of the officers entered the Taylor house and Bobbitt testified that he entered through the kitchen area where he remembers seeing Ruthie Taylor and one of her daughters. He had spoken with Ruthie Taylor prior to this incident and recognized her in the home. Bobbitt testified that Officer Strange was the first to enter the Taylor home in pursuit of Samuels. When Bobbitt entered the house, Officer Strange was in the bathroom and Officer Roscoe was wrestling with Samuels. Sergeant Whittis and Officer Lopez arrived shortly thereafter. Bobbitt conceded that the officers did not have a search warrant for the Taylor residence.
Officer Roscoe's testimony was consistent with Bobbitt's. He noted that he and Officer Strange were riding together and had been ordered by Sergeant Whittis to conduct a corner check at the intersection of Fairfield and 73rd streets. Roscoe had been with the Shreveport Police Department approximately three months at the time of this incident and *238 was not familiar with Samuels except through conversations with Officer Strange. He testified that when they approached the corner that day, they noticed no criminal activity, but saw a group of people gathered. As they approached the crowd dispersed. Samuels was part of that crowd and attempted to leave in a different direction than the others. Samuels had his hands in his pockets the entire time. As Samuels left the crowd, Officer Strange began to speak to him and asked Samuels to come to the police vehicle. Samuels did not respond and instead continued walking away. Samuels responded, "You don't want any part of me." Officer Strange then directed Officer Roscoe not to let Samuels out of his sight. Roscoe testified that he did not see any weapons, but did notice what he felt was some "type of contraband cupped in the palm of his hand."
As Roscoe approached Samuels, the walk turned into a run. Roscoe was told by Officer Strange to follow him into the house, and Roscoe was the first officer in. He remembered an older lady requesting that he "get him [Samuels] out of the house." At this point, Roscoe entered the home and saw Samuels exiting the bathroom. They ran into one another when Roscoe grabbed Samuels.
Officer Strange testified that he had been with the Shreveport Police Department for over three years when the incident in question occurred. He corroborated the testimony of the other officers and indicated that he had never seen Dexter Samuels prior to this date. Officer Bobbitt arrived prior to Strange and Roscoe. Strange testified that Samuels had his hands in his pockets and was attempting to elude Officer Bobbitt initially. In his opinion, Samuels' actions were suspicious. He further noted that after Samuels removed his hands from his pockets, he "saw bulges after he removed his hands and started to leave." Officer Strange then beckoned Samuels to his patrol car, which Samuels likewise avoided, stating that the officers wanted no part of him. Based upon these actions, Strange told Roscoe to pursue Samuels through "hot pursuit." Roscoe followed Samuels into the house with Strange on his heels. Strange testified that he likewise heard someone in the house say, "Get him out of my house, he doesn't belong here." He believed that Samuels was in possession of contraband and feared the loss of evidence. Based upon the observed bulging pockets, the statement made by Samuels, and the attempts to elude police officers, Strange believed that he possessed reasonable suspicion to stop Samuels. Officer Strange entered the bathroom after hearing someone say that Samuels was throwing something into the toilet. He fished four large packets of marijuana out of the toilet. He remembered Shirley Taylor, daughter of Ruthie Taylor, being very upset and indicating that the officers were upsetting her mother. Family members blocked the officers' exit.
Family members who were present in the Taylor house included the children of Mrs. Taylor, Shirley Taylor, Ruthie Taylor, Genner Taylor, Frank Taylor, Gladys Taylor Davis, and Rosie Taylor Lewis. Additionally, Edna Carpenter and Denise Ester were present in the house at the time of Dexter Samuels' entrance.
Dexter Samuels likewise testified. He stated that he had no drugs in his pockets and that Genner Taylor was in the bathroom as he entered the Taylor house. He said he was the boyfriend of one of the Taylor daughters and was thereby acquainted with the Taylors. All of the Taylor children echoed his testimony indicating that Genner was in the bathroom during the entire episode. Shirley Taylor indicated that she told Samuels and the police officers that they did not have permission to enter the home. Edna Carpenter, a friend of the family, testified that she heard Shirley tell Samuels and the police that they were not to enter the house. Genner Taylor testified that she was in the bathroom when the entire event occurred and that the toilet would not flush or was inoperable at the time of the arrest. Edna Carpenter and Denise Ester both testified that neither Samuels nor the police entered the bathroom.
The trial judge accepted the testimony of the police officers in this matter. This is a credibility call which is clearly within the province of the trial judge and will *239 not be set aside absent an abuse of discretion. State v. Bryant, 607 So.2d 11 (La. App.2d Cir.1992), writ denied, 632 So.2d 760 (La.1994); State v. Hamilton, 594 So.2d 1376 (La.App.2d Cir.1992). In light of the inconsistencies in the testimony of the Taylor children and guests in the house, we find no abuse of that discretion.
Nor can we find that the police officers violated any statutory or constitutional mandate or acted unreasonably so as to prevent them from invoking the doctrine of qualified immunity.
Pursuant to LSA-C.Cr.P. Art. 215.1(A), a police officer may stop a person in a public place whom the officer "reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions." Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasonable suspicion required for an investigatory stop is something less than probable cause required for an arrest. State v. Vance, No. 93-1389 (La.App. 4th Cir. 2/25/94) 633 So.2d 819. Reasonable suspicion must be determined under the facts of each case by whether or not the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. State v. Payne, 489 So.2d 1289 (La.App. 1st Cir. 1986), writ denied, 493 So.2d 1217 (La.1986). The totality of the circumstances must be considered in determining whether or not reasonable suspicion exists. State v. Belton, 441 So.2d 1195 (La.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). The detaining officers must have knowledge of specific articulable facts which, if taken together with rational inferences from those facts, reasonably warrant the investigatory stop. State v. Flowers, 441 So.2d 707 (La.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984). An officer's knowledge that a certain area is one of frequent criminal activity is a legitimate, recognized factor which may be used to judge the reasonableness of a detention. State v. Jones, 483 So.2d 1207 (La.App. 4th Cir.1986), writ denied, 488 So.2d 197 (La.1986). While flight, nervousness, or a startled look at the sight of a police officer is not, by itself, sufficient to justify an investigatory stop, this type of conduct may be highly suspicious and, therefore, may be one of the factors leading to a finding of reasonable cause. State v. Vance, supra; State v. Belton, supra; State v. Preston, 569 So.2d 50 (La.App. 4th Cir.1990).
We find these facts much like those in State v. Belton, supra. In Belton, officers went to a bar known for its drug activity. The officers were familiar with the defendant who had admitted to possession of pills the week prior. On the day of the incident, the officers drove into the cafe/bar parking lot to look around. There, they saw defendant who became nervous and then suddenly turned around and ran into the bar. Upon seeing defendant flee, the officers pursued, running into the bar. The officers ordered defendant to stop. As the officers entered the bar, they scanned the area and saw defendant. They seized him and patted him down in search of weapons. One of the officers saw a brown paper bag on the floor which he recognized as a common way of concealing drugs in this area. The bag contained a controlled dangerous substance, and defendant was arrested. The Louisiana Supreme Court found that the initial stop and resulting arrest and seizure of evidence was constitutional, noting that
Flight from the approaching officers, coupled with the other facts and circumstances known by the officers, was sufficiently suspicious to justify an investigatory stop based on reasonable cause to believe defendant had committed, was committing, or was about to commit a crime. Therefore, it was not an unlawful intrusion on defendant's right to be free from governmental interference when the officers ran after him and ordered him to stop.... Since the narcotics that were intentionally dropped by defendant as he ran into the bar were abandoned prior to any unlawful police conduct, they were lawfully seized. Once in lawful possession of the preludin tablets, the police had probable cause to arrest him.
State v. Belton, supra at 1199
In the instant case, police officers were instructed to conduct a "corner check" *240 of this known drug corner. The day before, Officer Lopez witnessed what he believed to be a drug transaction between two men. The other officers were aware of these circumstances as well. Officers Bobbitt, Roscoe and Strange noted Samuels with his hands in his pockets. Officer Strange saw Samuels "try to avoid" Office Bobbitt which in his mind constituted a suspicious action. At this point, he summoned Samuels to his car and Samuels informed him that he "didn't want any part of him." As Officer Strange informed Officer Roscoe not to let Samuels out of their sight, Samuels began running. Here, Officers Roscoe and Strange noticed bulges in Samuels' pockets consistent with contraband possession. After entering the house in pursuit of Samuels, Roscoe saw Samuels exit the bathroom where four bags of marijuana were seized. Much like that in Belton, the suspicious actions of Samuels in fleeing, his words to the officers, and the bulges noticed by the officers in his pockets were sufficiently suspicious to justify an investigatory stop. Also, just as in Belton, the defendant abandoned his contraband. Once the contraband was seized by Officer Strange, the officers gained probable cause to arrest Samuels
Accordingly, the individual officers clearly acted within statutory and constitutional authority and enjoy a qualified immunity from this suit pursuant to the provisions of 42 U.S.C.A. § 1983.

TORT LIABILITY
We now turn to the liability of the defendants under the provisions of LSA-C.C. Art. 2315, 2315.1 and 2315.2.
We first address the applicability of the public duty doctrine to the facts of this case. The public duty doctrine is found under the provisions of LSA-R.S. 9:2798.1 which notes in pertinent part:
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
Immunity from liability under these provisions for discretionary acts is essentially the same as the immunity conferred on the federal government by the exception in the Federal Tort Claims Act (FTCA). Kniepp v. City of Shreveport, 609 So.2d 1163 (La.App. 2d Cir.1992), writ denied, 613 So.2d 976 (La. 1993); Chaney v. National R.R. Passenger Corp., 583 So.2d 926 (La.App. 1st Cir.1991). The Louisiana Supreme court has adopted the United States Supreme Court two-step inquiry set forth in Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), to examine the application of immunity under FTCA to LSA-R.S. 9:2798.1. First, a determination must be made of whether a statute, regulation or policy specifically prescribes a course of action and, second, whether the challenged action is grounded in social, economic or political policy. This discretionary function exception to the governmental liability applies only where a policy judgment is made at the ministerial level and not at the operational level. Fowler v. Roberts, 556 So.2d 1 (La. 1989), on rehearing, 556 So.2d 13 (La.1989).
This court has addressed the application of the public duty doctrine to the actions of police officers in Kniepp v. City of Shreveport, supra. There, owners of property damaged in a riot asserted that police conduct caused their losses. The court determined that the actions of the police chief, in ordering withdrawal of officers from the area was a discretionary policy choice to protect life over property. Therefore, LSA-R.S. 9:2798.1(B) applied to shield the city from liability. However, no immunity was found for the acts of patrolmen who first entered the scene and whose conduct agitated bystanders and led to the riot. The court determined that their actions were operational and not based upon a balancing of social policy.
In the present case, as in Kniepp, the officers were conducting operational functions. While their decisions involved some discretion, consideration of policy was not an element of their choices. Thus, we find that the trial court erred in its finding that the public duty doctrine immunized the *241 city of Shreveport or the individual officers from tort liability.
We therefore address the issue of liability via the duty/risk analysis. As we noted in our analysis in Kniepp, supra, a defendant's conduct is actionable under the duty/risk analysis of LSA-C.C. Art. 2315 where it is both a cause in fact of the injury and a legal cause of the harm incurred. The cause-in-fact test requires that "but for" the defendant's conduct, the injuries would not have been sustained. The legal causation test requires that there be a "substantial relationship" between the conduct complained of and the harm incurred. Kniepp, supra; Nichols v. Nichols, 556 So.2d 876 (La.App. 2 Cir.1990), writ denied, 561 So.2d 92 (La.1990). The initial inquiry, however, is into the scope of the defendant's duty to the plaintiff. The duties of members of a city police department relate to its governmental function of maintaining public order. Nichols v. Nichols, supra; Tezeno v. Maryland Casualty Co., 166 So.2d 351 (La.App. 3d Cir. 1964). When a public official breaches a duty which is owed to the public in general, such breach of duty does not generally result in liability to an individual. However, when a personal or individual relationship arises between the police officer and an individual, liability may be imposed for breach of duty owed by the police officer to the individual. Nichols v. Nichols, supra; Serpas v. Margiotta, 59 So.2d 492 (La.App.Orl.1952). A duty owed to the public may be transformed into a duty owed to an individual through closeness in proximity or time. Once the personal or individual relationship has been established, the police officer then becomes obligated to conduct himself in such a way as not to cause the individual unnecessary injury. Nichols v. Nichols, supra; Tompkins v. Kenner Police Department, 402 So.2d 276 (La.App. 4th Cir.1981). Further, police, along with a duty to maintain order and to enforce the law, have a duty to prevent crime and protect the citizenry. Nichols v. Nichols, supra; Tezeno v. Maryland Casualty Co., supra.
In this case, even if it is assumed that under the circumstances the police officers developed a duty to Mrs. Taylor through time and proximity, there has been no breach of that duty. In our earlier analysis, we have determined that the officers possessed reasonable suspicion which escalated into probable cause and thereby were acting within their duty as police officers and violated no constitutional rights in doing so. Additionally, the officers possessed a duty to prevent crime and protect the citizenry which, in this case, they clearly fulfilled. The officers entered the house without the knowledge that Samuels was associated in any way with the Taylor family and possessed only the knowledge that he had committed or was about to commit a crime. In acting as they did, they were responsible for the removal of a criminal from the streets of Shreveport, as well as the Taylor home, in keeping with their duty to do so. Certainly, it cannot be asserted that a law-abiding citizen such as Mrs. Taylor would have wanted an individual such as Samuels in her home, and the evidence in fact indicates that she may have requested his removal therefrom. There is no evidence in the record before us which demonstrates that the officers dallied in any way in the home after the arrest of Samuels. Rather, the testimony from all parties indicates that the entire episode lasted only a few minutes. While the circumstances of Mrs. Taylor's death are unfortunate, when balanced against the duty owed to the general public, including this family, we find no breach of any legal duty which arguably could have been owed to Mrs. Taylor.
Because we find no breach of duty to Mrs. Taylor, it is not necessary that we address the liability of Chief Gruber of the city of Shreveport pursuant to the doctrine of respondeat superior. The judgment of the trial court is affirmed at appellants' cost.
AFFIRMED.