834 So.2d 1131 (2002)
Michael ASHMORE, et al.
v.
Rapides Parish Sheriff William E. HILTON, et al.
No. 02-816.
Court of Appeal of Louisiana, Third Circuit.
December 11, 2002.
Rehearing Denied February 12, 2003.
*1133 Edward Allen Kaplan, Attorney at Law, Alexandria, LA, for Plaintiffs/Appellees, Michael Ashmore, Patricia Ashmore, Amanda Ashmore.
Henry Gregory Walker Jr., Walker, Passman & Michiels, Alexandria, LA, for Plaintiff/Appellee, Amanda Ashmore.
Randall Brian Keiser, Keiser, Auzenne & Boudreaux, Alexandria, LA, for Defendant/Appellant, City of Pineville.
Court composed of HENRY L. YELVERTON, OSWALD A. DECUIR, and ELIZABETH A. PICKETT, Judges.
YELVERTON, J.
The City of Pineville appeals a trial court judgment which found it liable to Amanda Ashmore who alleged that she was raped by a trustee working for the City when she was doing community service work. Amanda answered the appeal seeking an increase in the award of damages and claiming that the trial court erred in dismissing her 42 U.S.C. § 1983 claim.

FACTS
On October 9, 1996, Amanda and her brother were sentenced by the Pineville city judge sitting as a juvenile court to perform 16 hours of community service. They were instructed to report to the City of Pineville Police Department on two Saturdays to fulfill their community service obligations.
The first Saturday they went to the Pineville Police Department was October 12, 1996. On that day, Amanda was assigned to work at Kees Park helping the ladies in the kitchen during the Catahoula Lake Festival. Her brother washed cars at the police station. They missed the next Saturday because they overslept, so they were required to report the following Saturday, October 26, 1996.
On October 26, Amanda was assigned to work at the Main Street Community Center. A police officer drove her there.
*1134 Once inside, a lady told her to help a man hang wallpaper. Amanda identified the lady as Dot Mikels. Dot was the manager of the community center. Amanda identified the man that she was assigned to help as Jerry Bass, a trustee who was incarcerated at the Rapides Parish Detention Center. The City and the Rapides Parish Detention Center had entered into an agreement in 1994 for the use of inmates outside of the detention facility.
Amanda was helping Bass hang wallpaper when a church group came in to use the facility. Amanda testified that Dot told them to go outside while the group was there. Amanda alleged that Bass told her to go into another building outside to clean up their mess. Once inside he pushed her down on a white drop cloth and raped her. Amanda was sixteen at the time.
Amanda never told her parents about the incident until almost a year later when she blurted it out while she and her sister were arguing. Her mother immediately called the police department and reported the incident. Shortly thereafter, her parents filed suit on her behalf against the City of Pineville, its chief of police, and Rapides Parish Sheriff William Earl Hilton. In 1999, upon reaching the age of majority, Amanda prosecuted the claim in her own name. Sheriff Hilton and former Chief of Police Jay Barber were subsequently dismissed, so the matter proceeded to trial solely against the City.
Trial was held on March 13 and 14 and June 13, 2001. The trial court found that Amanda was raped and that the City was responsible for her resulting injuries. It awarded her $3,365.64 in special damages and $150,000 in general damages. The court declined to find that the City was responsible for damages pursuant to 42 U.S.C. § 1983. The City appealed the judgment, and Amanda answered the appeal seeking an increase in general damages.

TRIAL COURT'S DETERMINATION THAT RAPE OCCURRED
The City argues that the trial court erred in finding that Amanda was raped because there was not sufficient evidence to prove it. The City would like to frame this error as a question of law of whether there was sufficient evidence, but we find that the issue is simply whether the trial court's factual finding that Amanda was raped was manifestly erroneous based on the evidence introduced at trial.
Even in a criminal setting where the elements of the crime must be proven beyond a reasonable doubt, "[t]he testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense." State v. Dickerson, 01-1287, p. 11 (La.App. 5 Cir. 6/26/02), 822 So.2d 849, 856. Therefore, a victim's testimony in a civil case is sufficient to establish her case where the burden of proof is by "a preponderance of the evidence" standard which is less burdensome than the "beyond a reasonable doubt" standard required in criminal cases. Miller v. Leonard, 588 So.2d 79 (La.1991); Chatelain v. La. Dep't of Transp. and Dev., 586 So.2d 1373 (La.1991).
A trial court's findings should not be overturned absent manifest error or unless clearly wrong. Stroik v. Ponseti, 96-2897 (La.9/9/97), 699 So.2d 1072. "Where two reasonable views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Id. at 1079.
Our careful reading of the record reveals that Amanda's version of the rape was always consistent. Also, members of *1135 Amanda's family testified with consistency regarding the circumstances under which they discovered that Amanda had been raped.
Bass testified. He denied that the incident occurred. He denied ever seeing Amanda. He also denied that anyone helped him hang wallpaper. There were other parties who remembered Amanda in the presence of Bass for a substantial amount of time. Dot Mikels testified that she saw Amanda helping Bass hang wallpaper and that she told both of them to move when a church group came into the center. Steven Schultz, a cousin of Amanda who was employed by the City in October 1996, testified that he transported both Bass and Amanda from the community center at the end of the day, with the three of them sitting in the front seat of his pickup together.
Dr. James Quillan, a psychologist who treated Amanda in 1997 after the rape was revealed, stated that he believed she was assaulted because she struck him as a straightforward youngster. While we note that the City has set forth examples of situations when Amanda was untruthful, we attribute these situations to the fact that she was a young teenager at the time dealing with difficult family problems. As observed by Dr. Robert Dorio, a clinical and forensic psychologist, Amanda did not necessarily view departures from societal norms in the same way as other people due to her socioeconomic status.
The trial court made a credibility decision to believe Amanda's testimony that she was raped. To disturb this finding would amount to a substitution of our credibility determination for its, which we are not in a better position to do. We find no error in this finding of facts, and so we will address the remaining issues in this case.

LEGAL STANDARD
The City argues that the trial court erred in not assessing fault to other parties and applying the wrong legal standard when it found that a resort to Veazey v. Elmwood Plantation Assocs. Ltd., 93-2818 (La.11/30/94), 650 So.2d 712, would be appropriate. We agree.
In Morrison v. Kappa Alpha Psi Fraternity, 31,805 (La.App. 2 Cir. 5/7/99), 738 So.2d 1105, writs denied, 99-1607, 99-1622, 99-1668 (La.9/24/99), 747 So.2d 1120, 749 So.2d 634, 635, the second circuit explained its approval of comparing the fault of an intentional tortfeasor with negligent parties. The court stated:
Plaintiffs argue that the trial court erred in allowing the jury to apportion fault to Jessie Magee, an intentional tortfeasor, and in refusing to instruct the jury on fault apportionment as set forth by the supreme court in Veazey....
A divided supreme court in Veazey, supra, held that generally, negligent tortfeasors should not be allowed to reduce their fault by the intentional act of another when they had a duty to prevent such intentional conduct. Veazey involved the interpretation of La. C.C. art. 2323, Louisiana's comparative fault provision, prior to its overhaul by the legislature in 1996.
In the 1996 Extraordinary Legislative Session, the legislature amended Civil Code articles 2323 and 2324 to require that fault be allocated to all persons causing a plaintiff's injuries (La.C.C. art. 2323) and to limit liability of each wrongdoer, with certain exceptions, to their percentage of fault. (La.C.C. art. 2324).
In Keith v. United States Fidelity & Guaranty Company, 96-2075 (La.05/09/97), 694 So.2d 180, the supreme court held that the 1996 revision *1136 of the La.C.C. art. 2323 was procedural and to be applied retroactively.
La. C.C. art. 2323 as amended by Act Three of 1996 provides in part:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability....

Given the clear pronouncement of our supreme court on this issue, we find that the trial court properly instructed the jury to compare the fault of all involved actors.
Morrison, 738 So.2d at 1112-13 (footnotes omitted)(emphasis in original).
Also, in Wallmuth v. Rapides Parish Sch. Bd., 01-1779, 01-1780 (La.4/3/02), 813 So.2d 341, at footnote 2, the supreme court approved this court's finding that the trial court committed legal error by refusing to assess the intentional tortfeasor with any fault and, therefore, conducting a de novo review. Even more recently, the supreme court has removed any doubt that Louisiana Civil Code Article 2323 "clearly requires that the fault of every person responsible for a plaintiff's injuries be compared, whether or not they are parties, regardless of the legal theory of liability asserted against each person." Dumas v. La. Dep't. of Culture, Recreation & Tourism, 02-563 (La.10/15/02), 828 So.2d 530, 537. As was done in Wallmuth, 813 So.2d 341, we will conduct a de novo review of the evidence and assess fault accordingly.
There is no doubt that Bass, as the perpetrator of the rape, should be assessed with fault. We will also discuss the fault of other persons who might be responsible.
The City tries to place blame on the Office of Juvenile Probation, arguing that it knew that the City had a policy in place that it did not accept female juvenile probationers. Jay Barber, the acting chief of police in October 1996, testified that he was not aware that juveniles were being assigned to the City police department to fulfill community service obligations.
On the other hand, David Iles, who was head trustee at the City police department, testified that he supervised both adults and juveniles who were doing community service work. He also stated that when there were female juveniles, they worked up front at the dispatch desk. He did testify that there were hardly ever any female juveniles brought to the police department.
Larry Spotsville, the chief juvenile probation officer, testified that the City accepted juveniles for some period of time but he thought at some point the City no longer wanted to accept juveniles for community service. He thought this decision *1137 was made sometime between 1995 and 1998.
Janie Melder, who worked with the juvenile probation office filling out disposition sheets on the juveniles, testified that she only knew to send juveniles to the police department and from there they would be assigned to various places.
Tracy Ferris, who was also employed with the juvenile probation office and assigned community service, testified that there were several places juveniles were sent, including the City police department. Although she never personally sent females to the police department, she did not remember the City having a policy in place of not wanting females for community service.
The fact is that Amanda was assigned to the police department, and it accepted responsibility for her on two occasions. There is no evidence that the police department tried to decline accepting her or her brother as community service workers. The police department actually assigned both Amanda and her brother duties and transported her to the places she was assigned to work.
The City has not established that it had a policy in place of not accepting juveniles for community service. It has not established that even if there was such a policy, this policy was communicated to the juvenile probation office. Even if it did tell the juvenile probation office that it no longer wanted juveniles, the evidence is not even clear when this decision was made; it could have been made long after Amanda was assigned to the City police department.
The City also argues that it was never told that Bass had the propensity to harm females and, therefore, the Sheriff should take blame for not advising it or even permitting him to participate in the trustee program. A review of the record reveals that there was not any evidence introduced by anyone that Bass presented a problem to females or that the Sheriff knew about it. Therefore, we cannot say that the Sheriff had a duty to warn the City.
Furthermore, the trustee work agreement between the detention center and the City specifically provided that it was the City's responsibility to supervise the trustee when he was working for the City. The agreement provided: "A commissioned officer shall be assigned and shall be responsible at all times for directly supervising the work performed by inmates." There is no doubt that Bass was not supervised by a commissioned officer when he was asked to leave the community center and go outside in the company of a teenage girl. It was the City's responsibility at that time to supervise Bass. Both Dot and her husband Robert, who was the public works director for the City, were commissioned officers. Robert testified that he supervised Bass most of the time, but he apparently was not around on October 26. Dot knew Bass was a trustee, but yet she sent him and Amanda out together with no supervision when the church group arrived.
In Sloan v. Dailey, 95-906 (La.App. 3 Cir. 12/6/95), 664 So.2d 792, this court explained that a town, which is the supervisor and beneficiary of work performed by criminal defendants who are sentenced to perform community service, has an obligation to provide the community service workers with a working place and conditions which are reasonably safe considering the nature of the work. Also, although the town is not required to insure the safety of the community service workers, it must exercise reasonable care to protect them against an unreasonable risk of foreseeable harm. Id.
*1138 Therefore, we find that the evidence establishes that the only responsible parties for this rape were Bass and the City. We will make a determination of each party's fault.

APPORTIONMENT OF FAULT
The factors to be considered when allocating fault among tortfeasors include those set out in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985):
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
With these factors in mind, it is our opinion that the majority of the fault should lie with the City. The City had a signed contract with the detention center that required it to supervise the trustee workers at all times, but instead it knowingly allowed a teenage girl to work side-by-side with a trustee and then promoted a situation where the teenage girl was left alone with the trustee who took advantage of the circumstances. Had the City simply never allowed Bass and Amanda alone together, this rape would never have occurred. Therefore, we find the City 70% at fault and Bass 30% at fault.

Louisiana Revised Statute 9:2792.8
The City claims that even if it was negligent then Louisiana Revised Statute 9:2792.8 provides that there is no cause of action for general damages, only medical expenses. The City claims that the trial court erred in concluding that there was evidence of "gross negligence" resulting in the City's responsibility for general damages.
Louisiana Revised Statute 9:2792.8(D) provides:
A community service worker shall have no cause of action for damages except for the payment of medical expenses, against the entity conducting the program or supervising his participation therein, including a municipality, parish, sheriff, or other entity, nor against any official, employee, or agent of such entity, for any injury or loss suffered by him during or arising out of his participation therein, if such injury or loss is a direct result of the lack of supervision or act or omission of the supervisor, unless the injury or loss was caused by the intentional or grossly negligent act or omission of the entity or its official, employee, or agent.
We agree that this statute limits the liability of those conducting and supervising community service programs to medical expenses unless the injury was caused by an intentional or grossly negligent act. After reviewing the supreme court's analysis of "gross negligence" in Ambrose v. New Orleans Police Dept. Amb. Serv., 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216, the trial court in the present case stated that:
[I]rrespective of who is charged with the duty of supervising inmate[s], one can fathom that even the most careless man would be accustom[ed] to believing that inmates should not be left alone and *1139 unsupervised with a young girl and that the failure to perform such supervision is wanting of diligence. Furthermore, it is believed that had a careless man exercised even slight care or any diligence and supervised either Amanda or Bass, Amanda would probably not have undergone this traumatic experience.
The following is the supreme court's definition of "gross negligence":
Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." "There is often no clear distinction between such [willful, wanton, or reckless] conduct and `gross' negligence, and the two have tended to merge and take on the same meaning." Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence.
Ambrose, 639 So.2d at 219-20 (citations omitted)(alteration in original).
The trial court found that the actions of the City were grossly negligent in failing to supervise an inmate-trustee who was working unsupervised and alone with a young girl. The trial court noted that "[w]hen inmates are incarcerated, they are secured in a facility and placed under supervision of guards for a reason. For the [City] to allow this unsupervised inmate to work amongst the citizens of Louisiana, especially alone with a young girl, defeats the very purpose of incarcerating that inmate."
We agree that the actions of the City in failing to have a commissioned officer directly supervising Bass at all times and in allowing Bass to be alone with a teenage girl, who was also its responsibility as a community service worker under its control, was grossly negligent. Therefore, we agree with the trial court that the City is also responsible for any general damages in addition to medical expenses.

GENERAL DAMAGES
Both the City and Amanda complain about the general damages award. The trial court found that a reasonable award for general damages in this case was $150,000.
The assessment of the appropriate amount of damages by a trial court or jury is a determination of fact which is entitled to great deference on review. Wainwright v. Fontenot, 00-492 (La.10/19/00), 774 So.2d 70. "`[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.'" Id. at 74 (quoting Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994)).
While it is true that Amanda had discipline problems and problems in school before the rape, she clearly experienced difficulties after the rape, as one would expect. She was ashamed about the whole event. Her mother testified that she became very violent and angry during the time period after the event. The rest of her family confirmed this observation.
The history taken by Dr. Quillan revealed that Amanda suffered with depression, *1140 was often unkempt and socially constricted, had sleep problems, was very anxious, and had low energy. After testing, Dr. Quillan confirmed his suspicions that she suffered with major depression as a result of the event. Dr. Quillan even noted in later sessions that Amanda may have post-traumatic stress disorder as a result of Bass's release from jail.
Dr. Quillan noted that the situation had caused significant anxiety problems, none of which were helped by family problems. The magnitude and character of the symptomology changed substantially following the rape.
We cannot say that the trial court's award of $150,000 general damages was an abuse of discretion. It is apparent that the rape has caused tremendous emotional and social problems for Amanda. Since the record also reveals that Amanda had a lot of problems before the rape, we will not increase the trial court's award.

42 U.S.C. § 1983
In her answer to the appeal, Amanda claims that the trial court erred in dismissing her claim for damages and attorney's fees under 42 U.S.C. § 1983. Amanda has argued that the City had juveniles in its custody, but had no policies or procedures in place to ensure their safety, thereby violating her constitutional rights. The court disagreed and found that the rape occurred solely due to the negligence of the City in failing to supervise Bass.
"[A] municipality can be sued under § 1983, but it cannot be held liable unless a municipal policy or custom caused the constitutional injury." Leatherman v. Tarrant County Narcotics and Intelligence Coordination Unit, 507 U.S. 163, 166, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993). "Further, the policy must be established by a showing that the municipality's decision maker with final authority regarding the policy had issued a proclamation, policy or edict or that a custom was established through a course of conduct by the practices of municipal officials which are so permanent or well-established so as to virtually constitute law." Taylor v. City of Shreveport, 26,820, pp. 3-4 (La.App. 2 Cir. 4/7/95), 653 So.2d 232, 236, writ denied, 95-1131 (La.6/16/95), 655 So.2d 333.
Municipal liability under Section 1983 attaches only when the official responsible for establishing final policy with respect to the subject matter in question, makes a deliberate choice to follow a course of action from among various alternatives. Thus, mere negligence on the part of local governmental final policy-makers does not give rise to governmental liability under Section 1983. A municipality may be held liable under Section 1983 for failing to adopt a policy when that failure rises to the level of "deliberate indifference" to the need for such a policy. Under this test, a governmental entity can be held liable if in the light of the duties assigned to specific officers or employees, the need for such a policy is so obvious, and the absence of such a policy is so likely to result in violations of constitutional rights, that the governmental entity's policy-makers can reasonably be said to have been "deliberately indifferent" to the need for the policy. Mere negligence by policy-makers in the face of unconstitutional behavior by municipal employees is insufficient to establish municipal liability under Section 1983."
Hicks v. Bexar County, Texas, 973 F.Supp. 653, 682 (W.D.Tex.1997) (footnotes omitted).
In this case, it is clear that the City had no policy in place for the juveniles doing community service. However, other than *1141 this incident, there is no evidence to suggest that the City needed to establish a policy. There was no testimony or evidence to suggest that any other juveniles performing community service work under the supervision of the City had any problems. Therefore, we agree with the trial court that Amanda has failed to prove a claim for damages under Section 1983.
For these reasons the judgment of the trial court is modified insofar as it failed to allocate fault to Jerry Bass, and amended in its amount to take into account our assessment of fault as to Bass and reduced fault as to the City of Pineville. Judgment is rendered finding fault on the part of Jerry Bass, and allocating 70% of the fault to the City of Pineville and 30% of the fault to Jerry Bass. The judgment against the City of Pineville is reduced to 70% of $153,365.64. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are assessed to the City of Pineville.
MODIFIED IN PART; AFFIRMED IN PART; AND RENDERED.