# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-996


**DENEE ASHLEY PIKE AND**

**TRENT PIKE, ET AL.**

**VERSUS**

**CALCASIEU PARISH SCHOOL BOARD**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2014-639
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and John E. Conery, Judges.

**CONERY, Judge, concurs in part and dissents in part and assigns reasons.**


**AFFIRMED IN PART, AS AMENDED, REVERSED IN PART, AND REMANDED.**

**H. Alston Johnson III**
**Kevin W. Welsh**
**Phelps Dunbar, LLP**
**400 Convention St., Suite 1100**
**Baton Rouge, LA 70802**
**(225) 346-0285**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Calcasieu Parish School Board**

**Vernon Ed McGuire, III**
**Plauché, Smith & Nieset**
**P. O. Drawer 1705**
**Lake Charles, LA 70602**
**(337) 436-0522**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Calcasieu Parish School Board**

**Somer G. Brown**
**Cox, Cox, Filo, Camel & Wilson, L.L.C.**
**723 Broad Street**
**Lake Charles, LA 70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Denee Ashley Pike**
    **Trent Pike**
    **Denee Ashley Pike obo minor son B.P.**
    **Trent Pike obo minor son B.P.**

**GREMILLION, Judge.**

The Calcasieu Parish School Board appeals the trial court's grant of the Motion for Judgment Notwithstanding the Verdict (JNOV) filed by Appellees, Denee and Trent Pike, individually and on behalf of their minor child, B.P.[1] For the reasons that follow, we affirm in part, as amended, reverse in part, and remand for further proceedings.

### FACTS AND PROCEDURAL POSTURE

The Pikes filed suit against the school board over incidents on the school bus that involved B.P. during his first-grade year. The matter proceeded to trial by jury, during which the following evidence was adduced.

B.P. was a first grader at Bell City High School (Bell City) at the beginning of the 2013 school year, when he and two other boys, K.M. and G.L., engaged in sexual activity on a school bus driven by Mr. John Keller. Before these incidents, all three boys had been repeatedly disciplined by Mr. Keller for disruptive behavior on the bus. Initially, Mr. Keller sat the three boys at the front seat to his right, where he could best observe them. However, because of some poor conduct on the part of some girls on the bus, Mr. Keller moved the three boys into the seat immediately behind him.

None of the three boys testified at trial, but other evidence showed that, at least, the boys displayed their genitals to each other and "put their mouths on" each other's genitals. One of the boys, G.L., told the Child Advocacy Center forensic interviewer that K.M. and B.P. inserted their penises in each other's "butts."

Around this time, B.P.'s mother claimed that she began to notice changes in his behavior. His teacher reported to Mrs. Pike that B.P. was disruptive and violent.

---

[1] In accordance with La.R.S. 46:1844(W), the initials of the minors involved in this case are substituted for their names to preserve confidentiality.

B.P. begged his parents to take him to school instead of making him ride the bus. He began to have afternoon "accidents" at school so that his parents had to pick him up. The Pikes took B.P. to counseling with Ms. Rachel Hinton in September 2013. They also asked B.P.'s primary care physician to determine whether there was some physiological cause of his "accidents."

In October 2013, B.P.'s plight came into focus when he told his mother that K.M. had put his mouth on B.P.'s penis. Mrs. Pike went to Bell City and spoke to Mr. Russell Abshire, the assistant principal in charge of elementary school discipline. Mr. Abshire interviewed all three boys. All agreed that the incidents were initiated by K.M., who was ten years old at the time; B.P. and G.L. were six. Mr. Abshire did not notify law enforcement authorities of the incidents.

Mrs. Pike did notify the authorities. The boys were interviewed by a forensic interviewer with the Child Advocacy Center as part of the Calcasieu Parish Sheriff's investigation of the matter. Again, there was no dispute that the incidents were initiated by K.M. Neither Mr. nor Mrs. Pike really know what took place on the bus and had been admonished by the forensic interviewer that it would be best for them to not discuss the incident or incidents with B.P.

K.M. had a history of behavioral challenges during his tenure at Bell City. Some of these challenges involved incidents that might be described as bathroom humor; others, though, were more overtly sexual in nature, including an occasion on which K.M. was found to have unfastened his pants on the playground and was attempting to engage another student to emulate his behavior so that they could "have sex." The other boy declined and informed a teacher. K.M. was also known to occasionally crawl beneath bathroom stalls while other children occupied them. As a result of the incident at issue, K.M. was expelled from Bell City to continue his education at an alternative school.

2

Before Mrs. Pike discovered what had occurred on the bus, she and her husband arranged for B.P. to receive counseling for his behavior issues at school. B.P.'s initial counselor was Ms. Rachel Hinton. Ms. Hinton first saw the Pikes on September 6, 2013. His mother confided in Ms. Hinton that B.P. was becoming angrier and overreactive to unpleasant circumstances, and that this behavior had arisen about six months before. On October 8, Mrs. Pike told Ms. Hinton that another student had asked B.P. to show him his genitals. Ms. Hinton taught B.P. about declining uncomfortable invitations and "safe touching."

On October 17, 2013, Mrs. Pike told Ms. Hinton about what she had learned about K.M. putting his mouth on B.P.'s privates. Ms. Hinton attempted to engage B.P. in a discussion about the incident, but he did not want to talk about it. B.P. asked Ms. Hinton to leave the room and informed his mother that a similar incident had also occurred with a friend or cousin at home.

By November 5, 2013, B.P. was much improved, but continued to have some issues. However, in December 2013, Ms. Hinton noted in her records that there was no need for continued appointments because the Pikes had not seen her in some time. Ms. Hinton observed that for the rest of their lives, victims of sexual abuse will encounter situations that dredge up their experiences.

After they learned of the issues on the bus, the Pikes took B.P. to counseling with Ms. Jodi Underwood. Ms. Underwood first saw B.P. on February 25, 2014, and treated him for three sessions, the last on April 8, 2014. Ms. Underwood did not testify at trial, but her records were introduced into evidence.

Thereafter, B.P. was treated by Mr. Ray Melerine, a licensed professional counselor who contracted with the school board to provide counseling services primarily for elementary school children. Mr. Melerine opined that the power differential between the older child, K.M., and the younger children, B.P. and G.L.,

3

vitiated B.P.'s consent, even if B.P. actively participated in the activity. B.P. had only confided in Mr. Melerine that an older child had "hurt" him and that he was angry about it. However, his records indicate that B.P. had never been raped. Mr. Melerine acknowledged that B.P. engaged in disruptive behavior at school before these occurrences, but that afterward, those disruptive behaviors escalated. He also opined that B.P. is at increased risk of engaging in activities similar to those that took place on the bus. Mr. Melerine treated B.P. at least monthly through December 6, 2015, and has seen him occasionally since, totaling four counseling sessions. He opined that B.P. will need two to three sessions of counseling until he turns eighteen and probably once a month thereafter.

B.P. was seen on March 29, 2017, by his primary care doctor, Dr. Keane O'Neal. Mrs. Pike told Dr. O'Neal that B.P. was experiencing anger management issues, for which Dr. O'Neal prescribed Paxil. On May 11, 2017, Mrs. Pike brought B.P. in with continued anger issues that she feared were not being adequately addressed by the Paxil. Dr. O'Neal switched B.P. to Zoloft.

The Pikes both testified about how this situation has altered B.P.'s personality. B.P. has lost a certain amount of confidence he had before. He goes periods in which he seems to do fine until something happens to remind him, after which he will experience a setback that can last for a while, usually assisted by counseling with Mr. Melerine. Mr. Pike admitted, though, that in his deposition taken in June 2016, he stated that he no longer saw any lingering effects from the bus incidents.

In support of their demands for damages for loss of consortium with their son, the Pikes both testified that they have lost faith in the school system. They felt their son was entitled to protection that he did not receive. They testified that what happened on the bus wrought changes in B.P.'s personality.

4

The Pikes also introduced the testimony of Ms. Stephanie Chalfin, a vocational rehabilitation counselor and life care planner. Ms. Chalfin was asked to prepare a life care plan for B.P. that assumed that he would require three counseling sessions a month until he reached age 18 and periodically thereafter. She was also asked to assume that B.P. was not able to return to school in the Calcasieu Parish School System, but would instead attend St. Margaret's, a private Catholic elementary and middle school B.P. had been moved to, and St. Louis, a Catholic high school. Ms. Chalfin opined that B.P. would require $98,744.00 to facilitate his lifelong counseling and schooling through high school graduation.

Ms. Kristi Thibodeaux, B.P.'s first grade teacher at Bell City, testified for the school board. B.P.'s behavior from the beginning of first grade was challenging to the point that conferences with Mr. Abshire and Mrs. Pike were held twice. Mrs. Pike expressed her opinion that B.P. was very gifted academically and was probably just bored with school. Ms. Thibodeaux, however, testified that she engages her first graders with almost constant work, so opportunities for boredom never present themselves. Further, B.P.'s challenging behaviors were consistent whether in the classroom, at recess, or in the bathroom. These conferences with Mr. Abshire and Mrs. Pike did not improve B.P.'s behavior. Mrs. Thibodeaux confirmed Mrs. Pike's testimony about B.P. wetting his pants in September and October 2013.

The jury returned a verdict in favor of the Pikes and awarding damages as follows:

| | |
|---|---|
| B.P.'s general damages | $62,500.00 |
| Mr. and Mrs. Pike's loss of consortium | $      0.00 |
| B.P.'s tuition at St. Margaret | $10,000.00 |
| B.P.'s future treatment | $19,000.00 |
| B.P.'s future tuition expenses | $20,000.00 |

The jury assessed 50% fault to the school board and 50% to K.M.

The Pikes filed a motion for JNOV, which the trial court granted on January 31, 2018. In its ruling, the trial court held the school board vicariously liable for K.M.'s acts, citing as authority La.Civ.Code art. 2320, which states in pertinent part, "Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their supervision." The article further provides that this liability attaches when the "teachers. . .might have prevented the act which caused the damage, and have not done it." Indeed, the trial court further stated that the school board "failed in its obligation to properly supervise KM and to protect BP." The trial court found that the jury's award was abusively low, and, conducting a de novo review of the evidence, increased the award to B.P. to $500,000.00. The failure to award the Pikes any sum for the loss of consortium claim was also found by the trial court to be an abuse of discretion, and the trial court awarded them $20,000.00; however, by operation of La.R.S. 13:5106, the total in general damages that could be assessed against the school board was $500,000.00. The other sums awarded by the jury were allowed to stand. The school board urged that the sums for future treatment be placed in a reversionary trust and that the general damage sum awarded to B.P. also be placed in trust. The judgment did not order that any sums be placed in trust.

## ASSIGNMENTS OF ERROR

The school board urges the following as errors:

1.
The trial court erred in granting the plaintiffs' motion for JNOV and vacating the jury verdict.

2.
Regardless of whether the trial court erred in granting the plaintiffs' motion for JNOV, it erred in the judgment which it then entered by failing to place the award to the minor child in trust and in failing to place the award of future medical expenses in a reversionary trust without judicial interest on that sum.

6

3.

In the alternative, if the trial court did not err in granting the plaintiffs' motion for JNOV, it erred in the judgment which it then entered by increasing the award to the minor child for "past and future general damages" from the jury's award of $62,500 to $500,000.

4.

In the alternative, if the trial court did not err in granting the plaintiffs' motion for JNOV, it erred in the judgment which it then entered by concluding that the school board is vicariously liable for the intentional conduct of a ten-year-old fellow student of the minor child.

5.

In the alternative, if the trial court did not err in granting the plaintiffs' motion for JNOV, it erred in the judgment which it then entered by concluding that the school board had breached its duty with respect to the plaintiffs' minor child and thus erred in assigning any fault to the school board with respect to its own conduct.

## ANALYSIS

The granting of a JNOV is governed by La.Code Civ.P. art. 1811, which gives a trial court latitude to allow a verdict to stand or to reopen the judgment and grant a new trial or render a JNOV. The article does not establish a standard for granting a JNOV or in reviewing a JNOV on appeal; those have been supplied by the courts.

[I]n *Anderson v. New Orleans Public Service, Inc.*, et al,583 So.2d 829 (La.1991)[,] [t]he supreme court discussed standards and guidelines applicable to trial courts and appellate courts in granting and reviewing judgments N.O.V. and stated:

"Once a trial court has concluded that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusively high or abusively low, it must then determine what is the proper amount of damages to be awarded. In making this determination, the judge is not constrained as the courts of appeal are to raising (or lowering) the award to the lowest (or highest) point which is reasonably within the discretion afforded that court. *Coco v. Winston Industries, Inc.,* 341 So.2d 332 (La.1976). We are aware of some decisions which indicate that the trial judge should be limited by that constraint. See *West v. Melancon,* 507 So.2d 1250 (La.App. 4th Cir.1987), *Barfield v. Jacobs,* 527 So.2d 555 (La.App. 3d Cir.1988), *Zeagler v. Dillard Department Stores, Inc.,* 521 So.2d 766 (La.App. 2d Cir.1988). However, we conclude that the better view is that expressed in *Rickerson v.*

7

*Fireman's Fund Insurance Company,* 543 So.2d 519, 523 (La.App. 1st Cir.1989), where the court stated:

> 'The *Coco* standard of review does not apply to a trial court's review of a jury's award. Therefore, after rendering the JNOV, the trial court should have rendered a de novo award based on his independent assessment of injuries and damages.'

> "The trial judge is in a better position to make a damage assessment than is an appellate court. The trial judge hears the testimony, views the evidence, and is able to evaluate the credibility of the witnesses. Once the jury verdict is set aside under the strict JNOV standards, the trial court is then the trier of fact. It should not be limited by the same constraints placed upon an appellate court reviewing a damage award. The trial judge should make an independent assessment of the damages and award a proper amount of compensation under the facts of the particular case.

> "The appellate court, in determining whether the trial court erred in granting the JNOV as to quantum, once again uses the criteria set forth in *Scott, supra,* [*Scott v. Hospital Service District No. 1,* 496 So.2d 270 (La.1986)], i.e., could reasonable men in the exercise of impartial judgment differ as to the fact that the jury award was either abusively high or abusively low. If the answer is in the affirmative, then the trial court erred in granting the JNOV, and the jury's damage award should be reinstated. On the other hand, if the answer is in the negative, then the trial court properly granted the JNOV, and its damage award based on its independent assessment of the damages is the judgment of the trial court which is reviewed on appeal under the constraints of *Coco,* supra."

*Loveday v. Travelers Ins. Co.*, 585 So.2d 597, 604 (La.App. 3 Cir.), *writ denied*, 590 So.2d 65 (La.1991). Thus, in order to grant a JNOV, the trial court must first determine that:

> the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. . . .If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied."

*Anderson*, 583 So.2d at 832. Further, the trial court is constrained from making credibility evaluations of witnesses, and all reasonable factual questions and reasonable inferences are construed in favor of the non-moving party. *Id.* If the trial court determines that a JNOV is warranted, it conducts a de novo review of the evidence to arrive at an appropriate award. *Id.*

On appeal, the court reviews the trial court's grant of JNOV using the same criteria as the trial court: do the reasonable inferences and factual questions preponderate so heavily in favor of the mover that reasonable minds could not disagree? If the answer is, "No," the trial court erred in granting the JNOV, and the verdict must be reinstated. *Id.*

*Should JNOV have been granted on the damage award to B.P.?*

There is no dispute in this case that B.P. has, understandably, suffered psychological damage as a result of the incidents on the bus for which he will periodically require counseling; that is not seriously disputed. Furthermore, since the accident, while at a different school operated by the school board, B.P. was ridiculed after a child who attended the school learned about the bus incidents through a parent. B.P.'s treatment with Ms. Hinton, Ms. Underwood, and Mr. Melerine proceeded in regular intervals until December 16, 2015, and he has been counseled on at least four occasions since.

However, the jury clearly considered the need for continued counseling, as it awarded him damages for future treatment. It awarded him damages for past and future tuition expenses at St. Margaret's and St. Louis' schools, further underscoring the jury's considered deliberation of the trust issues B.P. experiences about the school board's school environments. In these respects, the jury's verdict reflects careful consideration of the facts of the case.

9

And it is not as though there existed no inferences and factual questions regarding the extent of the psychological damage B.P. suffered; the issue is whether those inferences are reasonable. As mentioned above, B.P. first saw Ms. Hinton beginning in September 2013, and she testified that Mrs. Pike had told her that B.P.'s behavior had been deteriorating for about the previous six months. Six months would have considerably predated the incidents on the bus. Ms. Thibodeaux, B.P.'s first grade teacher at Bell City, testified extensively about B.P.'s behavioral challenges that also predated the incidents, including a propensity to violence. Ms. Hinton noted in her December 3, 2013, note that B.P. was much improved and there was no need for continued appointments. Mr. Melerine opined that B.P. would require three counseling sessions a month during the school year and twice during the summer months until he reaches eighteen, but B.P. had last seen Mr. Melerine or any other provider more than once a month in November 2015. On the basis of these facts, we cannot infer hyperbole regarding B.P.'s condition. As established above, B.P. underwent regular counseling for two-and-a-half years and was taking Paxil, then Zoloft, as late as 2017. We conclude that the trial court did not err in granting the JNOV as to B.P.'s damage award.

*Was the trial court's award on JNOV abusively high?*

> [B]efore a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence.

*Coco v. Winston Indus., Inc.*, 341 So.2d 332, 335 (La.1976) (citations omitted).

> "[T]he initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this

particular injured person is, a clear abuse of the trier of fact's "Much discretion," in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive or insufficient.

*Reck v. Stevens*, 373 So.2d 498, 501 (La.1979) (footnote omitted) (citations omitted). Because of the circumstances of individual cases, analysis of prior awards that have been approved is of little relevance in determining whether the award is abusively high or low. *Id.*

We conclude that an award of $500,000.00 is abusively high. B.P. has suffered psychic trauma as a result of this incident, but he continues to improve. His schooling situation has remained stable since enrolling at St. Margaret's. By all appearances, he continues to have issues with behavior at school, but he had those issues before this incident according to Ms. Thibodeaux, whose testimony was not contradicted.

At this point, we are allowed to refer to prior cases in order to establish the highest award that was within the trial court's discretion to award, which *Coco*, 341 So.2d 332, holds limits the degree to which we can alter the award.

In *S.J. v. Lafayette Parish School Bd.*, 08-900 (La.App. 3 Cir. 7/29/09), 16 So.3d 615, *rev'd on other grounds*, 09-2195 (La. 7/6/10), 41 So.3d 1119, a twelve-year-old girl was raped while walking home from school after serving detention. In the aftermath of the assault, the student's grades fell. She often refused to go outside her home. She experienced self-loathing and felt unloved. She came home from school crying daily. Other students teased her about the incident and asked if she had enjoyed it. Her experiences interacting with faculty were hardly better. She had to move schools twice.

Suit was filed against the school board, and the trial court dismissed that suit. On appeal, we reversed on the issue of liability and rendered judgment in the amount

11

of $100,000.00 in general damages. Based upon the evidence in the present record, the damage to this young girl clearly exceeds the harm B.P. experienced.

In *Ashmore v. Hilton*, 02-816 (La.App. 3 Cir. 12/11/02), 834 So.2d 1131, *writs denied*, 03-746, 03-750 (La. 5/9/03), 843 So.2d 401, 403, a sixteen-year-old juvenile sentenced to perform community service was raped by an inmate. Afterward, she became violent and experienced anger management issues for which she sought professional counseling. A psychologist diagnosed the victim with major depression, anxiety, and post-traumatic stress disorder after her attacker was released from jail. This court found that the trial court's award of $150,000.00 in general damages did not represent an abuse of discretion.

The defendant in *Ardoin v. Bourgeois*, 04-1663 (La.App. 3 Cir. 11/2/05), 916 So.2d 329, kidnapped, bound, beat, cut, and burned his victim, whom he held captive for three days. The trial court in that matter awarded her $25,000.00 in general damages for her "mental pain, anguish, grief, and fear[.]" *Id*. at 331-32. That judgment was affirmed by this court.

In *T.S. v. Rapides Parish School Bd.*, 08-1359 (La.App. 3 Cir. 6/3/09), 11 So.3d 628, *writ denied*, 09-1489 (La. 10/2/09), 18 So.3d 122, a high school student who was grabbed and "French-kissed" by a teacher on two separate occasions sued the school board and was awarded $45,000.00 in damages. After the incidents, she had to relive the incidents while testifying before a grand jury. She experienced nightmares about the incidents, panic attacks, and had trust issues with other men and with dating. We affirmed that award. The difficulties B.P. has experienced do exceed those of T.S.

Based upon our review of the record, we find that the highest general damage award within the trial court's discretion was $200,000.00. We reverse the trial

court's award of general damages to B.P. in the amount of $500,000.00 and amend the judgment to award B.P. $200,000.00 in general damages.

*Should JNOV have been granted on the Pikes' loss of consortium award?*

The Pikes both testified at trial about how these incidents have changed their relationship with their son, about the mental distress and anguish these incidents have caused them, about the distrust they have in the school board, and about the efforts they have expended in attempting to get their son treated. Their son exhibited increased issues with anger that persist, according to them. The medical documentation reveals that B.P. was treated for these issues for years. The jury awarded the Pikes nothing for their loss of consortium claim. We find that reasonable minds could not differ regarding the Pikes' loss and that the trial court did not err in granting JNOV to the Pikes on their loss of consortium claim. We do not find that the award represents an abuse of the trial court's discretion and affirm that portion of the judgment.

*Did the trial court err in failing to order that the sums awarded B.P. for future medical treatment be placed in a reversionary trust?*

Louisiana Revised Statutes 13:5106(B)(3) provides:

(a) In any suit for personal injury against a political subdivision wherein the court, pursuant to judgment, determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment, the court shall order that a reversionary trust be established for the benefit of the claimant and that all medical care and related benefits incurred subsequent to judgment be paid pursuant to the reversionary trust instrument. The reversionary trust instrument shall provide that such medical care and related benefits be paid directly to the provider as they are incurred. Nothing in this Paragraph shall be construed to prevent the parties from entering into a settlement or compromise at any time whereby medical care and related benefits shall be provided, but with the requirement of establishing a reversionary trust.

(b) Any funds remaining in a reversionary trust that is created pursuant to Subparagraph (3)(a) of this Subsection shall revert to the political subdivision that established the trust, upon the death of the

claimant or upon the termination of the trust as provided in the trust instrument. The trustee may obtain the services of an administrator to assist in the administration of the trust. All costs, fees, taxes, or other charges imposed on the funds in the trust shall be paid by the trust. The trust agreement may impose such other reasonable duties, powers, provisions, and dispute resolution clauses as may be deemed necessary or appropriate. Disputes as to the administration of the trust can be appealed to the district court. Nothing in this Paragraph shall preclude the political subdivision from establishing other alternative funding mechanisms for the exclusive benefit of the claimant. The terms and conditions of the reversionary trust instrument or other alternative funding mechanism, prior to its implementation, must be approved by the court. The parties to the case may present recommendations to the court for the terms and conditions of the trust instrument or other funding mechanism to be included in the order. Upon request of either party, the court shall hold a contradictory hearing before granting a final order implementing the reversionary trust or the alternative funding mechanism.

(c) In any suit for personal injury against the state or a state agency wherein the court pursuant to judgment determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment, all such medical care and related benefits incurred subsequent to judgment shall be paid from the Future Medical Care Fund as provided in R.S. 39:1533.2. Medical care and related benefits shall be paid directly to the provider as they are incurred. Nothing in this Subparagraph shall be construed to prevent the parties from entering into a settlement or compromise at any time whereby medical care and related benefits shall be provided but with the requirement that they shall be paid in accordance with this Subparagraph.

The school board is a political subdivision of the State. *See* La.R.S. 17:51.

Accordingly, under the stark language of La.R.S. 13:5106(B)(3), the trial court erred in failing to order that the $15,000.00 awarded to B.P. for future treatment be placed in a reversionary trust. Further, such awards are not entitled to imposition of legal interest. *Fecke v. Bd. of Supervisors of La. St. Univ.*, 15-1806, 15-1807 (La. 9/23/16), 217 So.3d 237, *modified on rehearing*, 15-1806, 15-1807 (10/19/16), 218 So.3d 1. We remand the matter to the trial court to establish a reversionary trust into which the future treatment funds will be placed and amend the trial court's judgment to exempt these funds from accrual of legal interest.

*Should B.P.'s general damage award have been placed in trust?*

Louisiana Code of Civil Procedure Article 4521 provides:

A. In approving any proposal by which a minor is to be paid funds as the result of a judgment or settlement, the court may order:

(1) That the funds be paid directly into the registry of the court for the minor's account, to be withdrawn only upon approval of the court. Withdrawn funds shall be invested directly in an interest-bearing investment as approved by the court unless the court for good cause approves another disposition.

(2) That the funds be invested directly in an interest-bearing investment approved by the court, unless the court for good cause approves another disposition.

(3) That the funds be placed in trust in accordance with the Louisiana Trust Code to be administered by an individual or corporate trustee as determined by the court.

(4) That the funds be paid under a structured settlement agreement as approved by the court that provides for periodic payments and is underwritten by a financially responsible entity that assumes responsibility for future payments.

(5) Any combination of Subparagraphs (1) through (4) of this Paragraph.

B. In approving any proposal by which funds will be paid to an unemancipated minor who is in the legal custody of the Department of Children and Family Services, the court shall order that the funds be placed in trust in accordance with the Louisiana Trust Code and the provisions of Article 4269.1, to be administered by an individual or corporate trustee as determined by the court.

C. In determining whether a proposed periodic payment schedule is in the best interest of the minor, the court shall consider the following factors:

(1) Age and life expectancy of the minor.

(2) Current and anticipated financial needs of the minor.

(3) Income and estate tax implications.

(4) Impact on eligibility for government benefits.

(5) Present value of the proposed payment arrangement and the method by which the value is calculated.

The purpose of La.Code Civ.P. art. 4521 is to ensure that the "funds adjudicated to a minor are 'used, administered, and conserved to the benefit of the minor.'" *Snowden v. Huey P. Long Hosp. through State, Dep't of Health & Human Res.*, 581 So.2d 287, 290 n.2 (La.App. 3 Cir.), *writ denied*, 583 So.2d 483 (La.1991). However, the statute draws a distinction between when such options are mandatory or permissive is its use of "shall" and "may." When the minor child awarded a judgment "is in the legal custody of the Department of Children and Family Services, the court shall order that the funds be placed in trust in accordance with the Louisiana Trust Code and the provisions of Article 4269.1, to be administered by an individual or corporate trustee as determined by the court." La.Code Civ.P. art. 4521(B). In other cases, the court "may" order certain dispositions, as set forth in Paragraph (A). We are aware of no jurisprudence that mandates that sums paid to a minor must be placed in one of the five allowable options. These options are codified to expand a trial court's options to protect a minor child's funds, not to limit them. Natural tutors, such as the Pikes, are solidarily obligated to act as prudent administrators of B.P.'s property and are personally liable for failure to act. La.Code Civ.P. art. 4262. We affirm the trial court's refusal to order that B.P's damages be placed in trust or some other vehicle pursuant to La.Code Civ.P. art. 4521.

*Should the trial court have granted JNOV regarding the assessment of fault?*

The allocation of fault between intentional tortfeasors and negligent tortfeasors has perplexed Louisiana courts since the adoption of our pure comparative fault system. In the context of a sexual-assault case, the Louisiana Supreme Court stated that the comparative fault scheme "is broad enough to encompass the comparison of intentional acts and negligence in appropriate factual circumstances[.]" *Veazey v. Elmwood Plantation Assoc., Ltd.*, 93-2818, p. 11 (La. 11/30/94), 650 So.2d 712, 718-19. However, in that context, the supreme court ruled

16

that such allocation was improper for three reasons: the exact risk that caused the plaintiff's damage was within the scope of the negligent tortfeasor's duty to protect her against; the negligent tortfeasor should not be allowed to benefit from the allocation of fault to an actor whose deeds were within the scope of the negligent tortfeasor's duty; and, since the vast majority of fault would be allocated to the intentional tortfeasor by a rational trier of fact, the application of comparative fault principles would lessen the incentive of the negligent tortfeasor to protect against a similar occurrence in the future. *Id.*

Since *Veazey*, the legislature amended the comparative fault statute, La.Civ.Code art. 2323, by 1996 La. Acts No. 3, 1st Ex. Sess. In *Dumas v. State ex rel. Dep't of Culture, Recreation & Tourism*, 02-563 (La. 10/15/02), 828 So.2d 530, the supreme court recognized that this change requires the allocation of fault to all actors regardless of the theory of liability applicable to each actor.

The present situation poses a very close parallel to *Veazey*, 650 So.2d 712. In *Veazey*, the apartment owner was liable for negligence in its security precautions. The rape of its tenant was precisely the risk the landlord was tasked with a duty to prevent. In this case, the school board was tasked with the duty to protect its students and adequately supervise those children to prevent them from harming each other. On the other hand, though, we have the clear dictate of the supreme court in *Dumas*, 828 So.2d 530, that the courts are to assess the fault of all actors.

In granting the Pikes' JNOV on the issue of fault allocation, the trial court held:

> The Court finds that as a matter of law the Calcasieu Parish School Board is vicariously liability for the acts of KM. The School Board's duty under art.2320 imposes liability for the actions of KM which the school board knew or should have known were foreseeable. The School Board failed in its obligation to properly supervise KM and to protect BP. Support for this ruling is found in *Doe, ex rel. v. DeSoto Parish School Board*, 907 So.2d 275 (La.App. 2 Cir.6/29/05),*writ*

17

*denied* 924 So.2d 167 (La.2/10/06) and other authorities cited to the Court.

In interpreting La.Civ.Code art. 2320, our courts have determined that traditional duty/risk analysis governs whether the school board is liable in negligence for failing to provide reasonable supervision of students that is appropriate to their age. *Wallmuth v. Rapides Par. Sch. Bd.*, 01-1779 (La. 4/3/02), 813 So.2d 341. Constant supervision of students is not possible, and schools are not the insurers of their students' safety. *Id.* Furthermore, "the risk of unreasonable injury must be foreseeable, constructively or actually known, and preventable if a requisite degree of supervision had been exercised." *Id.* at 346 (quoting *Wallmuth v. Rapides Parish School Bd.*, 01-42, p. 5 (La.App. 3 Cir. 5/16/01), 802 So.2d 28, 32).

*Doe*, 907 So.2d 275, involved the sexual assault of a girl by five boys on a school bus transporting male and female high school basketball players. School board policy established that a coach was to occupy a seat separating the boys' team from the girls', but the coach was not sitting there; rather, the coach was seated in the front of the bus. The school board complained that the trial court refused to assess the fault of the five boys and the girl, whose participation was allegedly consensual. Our colleagues on the second circuit held that allocating the fault of the boys would have no practical effect. The school board's duty was to supervise the boys, in part to prevent them from harming others.

This is the correct result. The risk that K.M. would behave in an entirely inappropriate manner constitutes the very essence of the reasonable-supervision duty imposed by La.Civ.Code art. 2320. Further, from a practical perspective, it would have represented the correct result even if K.M.'s parents had been named

18

defendants to the suit because, under La.Civ.Code art. 2318,[2] K.M.'s parents, having placed their son under the school board's care, would have recourse against the school board under the same theory of negligent supervision. Allowing the school board the benefit of the assessing of fault to a tortfeasor it is bound to supervise defies logic. The trial court's grant of JNOV on the assessment of fault is affirmed.

## CONCLUSION

The trial court did not err in granting the Pikes' JNOV on the issue of damages, but did award excessive general damages to B.P. The award of $500,000.00 to B.P. for general damages is abusively high, and we amend the trial court's award to $200,000.00, the highest amount within the trial court's discretion. The trial court did not err in granting the Pikes' JNOV on the failure of the jury to award them damages for loss of consortium. That grant of JNOV and the damage award to the Pikes individually is affirmed. The award to B.P. for future treatment must be placed into a reversionary trust, and we remand the matter to the trial court for the creation of a reversionary trust, and modify the trial court's judgment to exempt those funds from accruing judicial interest. The trial court did not err in mandating that B.P.'s general damage award be placed into an investment vehicle described in La.Code Civ.P. art. 4521. The trial court also correctly granted JNOV on the allocation of fault. Costs of this appeal in the amount of $12,839.00 are taxed equally between the parties.

---

[2] Louisiana Civil Code Article 2318 reads:

> The father and the mother are responsible for the damage occasioned by their minor child, who resides with them or who has been placed by them under the care of other persons, reserving to them recourse against those persons. However, the father and mother are not responsible for the damage occasioned by their minor child who has been emancipated by marriage, by judgment of full emancipation, or by judgment of limited emancipation that expressly relieves the parents of liability for damages occasioned by their minor child.

**AFFIRMED IN PART, AS AMENDED, REVERSED IN PART, AND REMANDED.**

DENEE ASHLEY PIKE AND TRENT PIKE, ET AL.

VERSUS

CALCASIEU PARISH SCHOOL BOARD

Conery, J., concurring in part, dissenting in part.

I join in the majority's determination that this matter must be remanded with instructions to place the award for future medical treatment in a reversionary trust pursuant to La.R.S. 13:5106. I further join in the amendment of the judgment to reflect that those funds will not accrue judicial interest.

However, on the larger issue of the JNOV, I respectfully dissent. I would instead reverse the JNOV in its entirety and reinstate the jury's verdict as I find that the trial court erred with regard to its decision to grant a JNOV regarding damages and vicarious liability.

Authorized by La.Code Civ.P. art. 1811, a motion for JNOV is "a procedural device … by which the trial court may modify the jury's findings to correct an erroneous jury verdict." *Pitts v. La. Med. Mut. Ins. Co.*, 16-1232, p. 7 (La. 3/15/17), 218 So.3d 58, 64. While the majority suggests that Article 1811 provides a trial court with latitude to render a JNOV, reference to the Article merely indicates that "[i]f a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or render a [JNOV]." It does not provide the standard by which the trial court may do so. Rather, jurisprudence supplies that standard as follows:

[A] JNOV is warranted when the facts and inferences point so strongly

and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact."

*Id.* at 64-65, pp. 5-6 (quoting *Joseph v. Broussard Rice Mill, Inc.*, 00-628 (La. 10/30/00), 772 So.2d 94, 99).

On review, an appellate court first evaluates whether the trial court erred in granting a motion for JNOV. *Joseph*, 772 So.2d 94. Citing its earlier decision in *Anderson v. New Orleans Public Service, Inc.*, 583 So.2d 829 (La.1991), the supreme court explained that:

This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

*Id.* at 99. *See also Brown v. Breaux Bridge Ventures, LLC*, 17-440 (La.App. 3 Cir. 2/15/18), 239 So.3d 319*, writ denied*, 18-444 (La. 5/11/18), 242 So.3d 568; *Guillory v. Progressive Ins. Co.*, 12-1284 (La.App. 3 Cir. 7/3/13), 117 So.3d 318.

In keeping with above directive regarding the jury's role as factfinder, the supreme court has repeatedly reinstated a jury's verdict after the appellate courts have affirmed the JNOV granted by trial court. For example, in *Trunk v. Medical Center of Louisiana*, 04-181, pp. 9-10 (La. 10/19/04), 885 So.2d 534, 539, the

2

supreme court reinstated a jury's selective award of damages in a medical malpractice matter, noting the interplay of credibility and assessment of quantum as follows:

> At the close of the evidence, the jury awarded plaintiff damages in the amount of $52,901.79. This award included $35,000.00 in physical pain and suffering and $17,901.79 in past medical expenses. The jury did not award damages for mental pain and anguish, permanent disability, future medical expenses, or future loss of earning capacity. The assessment of "quantum," or the appropriate amount of damages, by a jury is a determination of fact that is entitled to great deference on review. *Wainwright v. Fontenot,* 00–0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. A thorough review of the record in this case indicates the jury's awards were reasonable in light of the evidence presented. The jury obviously believed plaintiff sustained some damages as a result of the fall as it awarded her a significant amount of damages for physical pain and suffering and for her past medical expenses. The jury's failure to assess damages for mental pain and anguish, permanent disability, future medical expenses, and future loss of earning capacity indicates they might not have believed plaintiff's injury was as severe or as persistent as she contended. It is probable the jury did not believe that her injury was the reason she was not chosen for a gastroenterology fellowship. Additionally, the fact that the jury did not award damages for future medical expenses leads us to believe that the jury determined plaintiff was not in need of future medical care for symptoms related to the injuries she sustained in the fall. The record contained conflicting evidence related to the extent of plaintiff's injury, pain, and physical limitations. Plaintiff's credibility was challenged by defense witnesses. In light of the conflicting nature of the evidence presented at trial, we cannot say that the jury's verdict was unreasonable. Stated differently, we find that based on the evidence presented in this case, reasonable minds could differ on the assessment of damages. The amounts awarded by the jury were well within its vast discretion. Therefore, we find the district court erred in granting a JNOV.

It further remarked that "[t]he rigorous standard of JNOV is based upon the principle that 'when there is a jury, the jury is the trier of fact." *Id.* at 537 (quoting *Joseph*, 772 So.2d at 99).

The supreme court held similarly in *VaSalle v. Wal-Mart Stores, Inc.*, 01-462 (La. 11/28/01), 801 So.2d 331, a case in which a trial court granted a JNOV on damages and the appellate court affirmed. The supreme court reversed the trial and

3

appellate court rulings, explaining that:

> At the close of trial, the jury awarded plaintiffs a total of $70,000 in damages. This award included $15,00[0] in past medical expenses, $20,000 in future medical expenses, $25,000 in past, present, and future mental and physical pain and suffering, and $10,000 in future loss of earning capacity. The jury made no award for permanent disability or loss of consortium for Mr. VaSalle. After considering the record in its entirety, we find these awards were reasonable based on the evidence presented. It is apparent the jury believed Ms. VaSalle sustained some damages as a result of the Wal–Mart accident. However, the jury's awards indicate it is possible the jury found Wal–Mart was not the sole cause of Ms. VaSalle's back problems and resultant medical bills. Such a conclusion is reasonable in light of the evidence presented at trial. After weighing the totality of the evidence, we conclude that reasonable, fair-minded jurors could have arrived at differing damage awards. Plaintiff did not seek immediate treatment for her injuries and had been involved in two previous accidents in which her back was injured. Plaintiff continued to work as a house cleaner after the accident and, in fact, admitted she worked even more following the accident than before it. Plaintiff's credibility was seriously challenged and called into question by defendants. The experts disagreed on the extent of plaintiff's injuries and her need for surgery. Dr. Bernauer did not find any objective evidence of plaintiff's complaints at her first visit and diagnosed only muscle strain. Thus, based upon the evidence presented at trial, we cannot say the jury's verdict was unreasonable. Therefore, the district court erred in granting a JNOV.

*Id.* at 341-42. *See also Davis v. Wal-Mart, Inc.*, 00-445 (La. 11/28/00), 774 So.2d 84.

Like the fact situations present in the above supreme court jurisprudence, the record review in this case indicates that the trial court was required to deny the motion, as a JNOV should only be entered "when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions[.]" *Joseph*, 772 So.2d at 99.

As to the JNOV on damages, the parents have attributed the child's schooling and behavioral difficulties to the bus incidents, which occurred over a period from approximately September 26 through October 8, 2013. The plaintiffs contend that the child's difficulties were either different in nature or did not arise until after the

4

bus incidents. The parents further related the bus incidents to the child's disruptive behavior both at home and in the school room, necessitating a change in school and in counseling. They claimed that the bus incidents led to the child's emotional issues such as anger, feelings of isolation, and thoughts of death.

However, the jury heard testimony regarding the plaintiffs' child's behavioral problems that long predated the subject bus conduct. For instance, during the child's preceding kindergarten year, school records indicated that he was reported for having pulled down his pants, exposing himself on the school bus. Other displays of sexual behavior during that time frame were attributed to learned behaviors from either a cousin or television.

And, in the weeks before the school bus incidents, the child's teacher reported classroom difficulties leading to repeated conversations between the school and the plaintiffs about that behavior. The teacher's notes, introduced into evidence, indicate that the teacher reported "negative behavior" both in the classroom and during "unstructured times like walking to and from places, lunch, etc." A telephone conference with the child's mother was held on August 21, 2013 in that regard. An additional note by the teacher indicated that the child's "most frequent display of negative behavior is his attitude – shrugging shoulders, slamming himself down in his desk when disciplined …, smacking his lips - - being disrespectful to the teacher." The note indicates that due to "bathroom trouble every time he goes to the bathroom," the plaintiffs' child was required to "[go] to the restroom by himself." The note did not explain what the "bathroom trouble" was, nor could the teacher recall the details of that incident in her testimony at court.

When the teacher's notes were forwarded to the school's assistant principal, he commemorated on a copy of the corresponding email, which was introduced in

5

evidence, that he had informed the "parent" by telephone that the child had been in his office due to "classroom disruption." He described the mother as "very supportive" and that the child was being taken to a counselor the following week "because he has been exhibiting the same behaviors at home." Finally, during a September 24, 2013 conference, a date immediately preceding the events at issue, the teacher reported that the "negative behavior" continued and that the child's mother explained that an "outside counselor" had "suggested having him tested for AD(H)D[.]"

The jury was further informed by the bus driver that the child had displayed disruptive behavior on the bus before the incidents in question, along with the other two boys involved in this incident. The disruptive behavior resulted in the driver's placement of the boys in the designated seating where the sexual conduct at issue subsequently occurred. The previous school year, the bus driver completed a "Behavior Report," describing that the child was "throwing things on bus and giving the bird to several others."

Similarly, Rachel Hinton, a licensed professional counselor, testified that the child began treatment with her prior to the bus incident. She told the jury that, on September 6, 2013, a date almost three weeks prior to the subject conduct, the plaintiffs related concerns that the child "seems very angry, yelling at mom, mad, blames, if he messes up, he thinks it ruins his whole day or his whole day is shot, kind of shuts down. If at first it doesn't go well, he's shutting down, concerns with when he gets upset, kind of melts down." According to Ms. Hinton, the mother reported that she had noticed this behavior for approximately six months. That testimony, coupled with school records, testimony by school officials, and the evidence in the record undermined the plaintiffs' claim of a sudden change in the

6

child's emotional wellbeing due to the sexual conduct on the bus, and their claim that the resulting damages were fully attributable to the sexual conduct on the bus during the two-week period in 2013.

Given that factual overlay of the child's varied behavioral problems, the jury acted well within its discretion in concluding that the plaintiffs failed to prove that the conduct at issue caused the totality of the claimed damages. Rather, the counselor who began seeing the child after the incident in question, Ray Melerin, acknowledged that isolation of the school bus event as a causative factor to subsequent problems was "just difficult." Mr. Melerin explained that he was not provided with full information regarding the child's preexisting problems and that he was treating the child's symptoms, regardless of the causation. When asked whether some of that background information would "have been nice to have had" in addressing the causation questioned posed, he responded: "Possibly. I would definitely have wanted to learn more information about what took place back then." Mr. Melerin further explained to the jury that:

> [P]lease - - please understand, my job is not necessarily about determining that, you know. So when I have a child in my office and we're dealing with - - we're not thinking - - I'm not trying to put a percentage to things. It's just not how, you know, we naturally operate, but … being asked to do that right now, I'm trying, and there - - there are just too many variables involved. And all - - you know, all I can say about it is that I think it's quite possible that there is a level of degree that has affected him that no one will ever know for sure. There's no measuring tool for that, but - - but there's a real possibility that it has.

In the least, the jury was informed of preexisting, documented behaviors supportive of a finding that the child suffered from a continuum of emotional difficulties that long predated the sexual conduct at issue here.

It is within that context of complex causative background that the jury received the case, undermining the plaintiffs' contention in its motion for JNOV that

7

greater damages were required. To the extent the jury's assessment of damages was based on credibility determinations of the witnesses' testimony, plaintiffs' testimony, that of their experts, or the jury's review of all the evidence, those determinations are inappropriately re-evaluated within the JNOV context. *Id.* They instead must remain within the jury's province.

The record similarly supports the jury's rejection of the plaintiffs' claim for loss of consortium, whether due to issues related to evidence of causation or those related to credibility of their testimony.

The remaining issue, the JNOV as it related to liability upon application of La.Civ.Code art. 2320, is a legal one, although the trial court addressed it within its consideration of the motion for JNOV. Whether by operation of La.Civ.Code art. 2320 or by La.R.S. 9:3921, the School Board is liable for the conduct of its own employee. And, in fact, the jury found it was liable in that regard, assessing it with 50% of the fault. Neither the School Board's own negligence nor that apportionment is contested in this appeal.

As for the jury's apportionment of the remainder of fault, the record is clear that the ten (10) year old did, in fact, molest the plaintiffs' child during that approximate two week period while the children were on the bus. Plaintiffs' counsel made a calculated decision not to name the parents of that child as a joint tortfeasor, hoping that the jury would ascribe 100% fault to the School Board. The judge appropriately charged the jury and submitted a jury interrogatory allowing the jury to apportion fault between the School Board and the intentional ten year old tortfeasor who, admittedly, sexually molested the plaintiffs' son. That charge and resulting jury interrogatory were in keeping with the dictates of La.Civ.Code art. 2323(B), which provides that the principle of comparative fault "shall apply to any

8

claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability." *See also Dumas v. State ex rel. Department of Culture, Recreation & Tourism*, 02-563 (La. 10/15/02), 828 So.2d 530.

Well prepared attorneys presented the case to the jury, and the jury, after due deliberations, returned its verdict as follows:

1. Do you find that the Calcasieu Parish School Board was negligent and, if so, did the negligence cause injury to [B.P.]?

YES __√__    NO _____

If you answered YES to Question 1, proceed to Question 2.

If you answered NO to Question 1, sign the form and advise the Bailiff.

2. Please state the percentage of fault, if any, attributable to the following:

| | |
|---|---|
| Calcasieu Parish School Board | **50%** |
| [K.M.] | **50%** |
| Total | **100%** |

Obviously, the jury attributed a corresponding, but distinct, 50% of the fault to K.M., the ten (10) year old independent intentional tortfeasor.

Despite the jury's apportionment of fault, the trial court further applied La.Civ.Code art. 2320 in its ruling on the JNOV and found the School Board liable for the intentional actions of the student, K.B., a ten (10) year old riding on the bus after school. In my opinion, this was error and a departure from the plain language of Article 2320.

As pointed out by counsel for the School Board, the supreme court has explained that Article 2320 "is not a true 'vicarious liability' statute[.]" *Wallmuth*

*v. Rapides Par. Sch. Bd.*, 01-1779, p. 13 (La. 4/3/02), 813 So.2d 341, 349. The Article instead "'requires independent fault on the part of the School Board in that the School Board is only liable for damages caused by students under their supervision when the school board, the teacher, or other school authorities 'might have prevented the act which caused the damages and have not done so.'" *Id.* That is precisely the independent liability that the jury found on the part of the School Board in this case when assessing fifty (50) percent fault to the School Board. To apply Article 2320 to more broadly hold the School Board liable for the student's intentional tortious conduct at issue would hold it financially responsible for a tort in which it did not contribute independent fault.

The plaintiff further points to that aspect of Article 2320 which indicates that: "Teachers … are answerable for the damage caused by their scholars …, while under their supervision[,]" as applicable in this case. The present situation, however, plainly does not involve supervision by a teacher. "[B]y its nature, vicarious liability mandates strict construction." *Roberts v. State, ex rel. La. Health & Human Res. Admin.*, 404 So.2d 1221, 1225 (La.1981). Although the bus driver may have been an employee, he was not a *teacher* so as to implicate the wording of La.Civ.Code art. 2320 and shift the fault of the intentional tortfeasor student to the "teacher" and School Board.

It is on this latter basis that the case cited by the trial court, *Doe v. DeSoto Par. Sch. Bd*, 39,779 (La.App. 2 Cir. 6/29/05), 907 So.2d 275, *writ denied*, 05-2020 (La. 2/10/06), 924 So.2d 167, is distinguishable. Significantly, in that second circuit case, a school board was found liable under La.Civ.Code art. 2320 for the intentional tort of a student on a fellow student when the supervision was by a coach. While not explicitly stated in *Doe v. DeSoto Parish School Board*, the court seemingly

10

equated the position of coach as one of "teacher" for purposes of the Article. It is clear, however, that the case did not involve a bus driver as here. *Id.*

More persuasive is the factually similar matter of *Doe v. East Baton Rouge Parish School Board*, 06-1966, p. 9 (La.App. 1 Cir. 12/21/07), 978 So.2d 426, 435, *writ denied*, 08-189 (La. 3/28/08), 978 So.2d 306. In that case, the first circuit found *Doe v. DeSoto Parish* inapplicable to the matter before it which, like here, involved "students under the supervision of a bus driver, a non-teacher" rather than a coach. *See also Bell v. Ayio*, 95-534 (La.App. 1 Cir. 11/13/98), 731 So.2d 893, *writ denied*, 98-3115 (La. 2/5/99), 738 So.2d 7; *Wijngaarde v. Parents of Guy*, 97-2064 (La. 9/2/98), 720 So.2d 6, *writs denied*, 98-3144, 98-3152, 98-3162 (La. 2/12/99), 738 So.2d 574, 575. The panel further distinguished a fourth circuit case, *Vaughn v. Orleans Par. Sch. Bd.*, 01-0556 (La.App. 4 Cir. 11/28/01), 802 So.2d 967, *writ denied*, 02-0005 (La. 6/7/02), 818 So.2d 773, a case involving teacher supervision, on the same basis.

After setting forth the supreme court's discussion in *Wallmuth*, the first circuit in *Doe v. East Baton Rouge Parish School Board*, 978 So.2d at 435-36 (footnotes omitted), explained further that:

> [A]fter an analysis of the terms of LSA–C.C. art. 2320, we find that the School Board is not vicariously liable for the actions of H.B. under the facts and circumstances of this case. As noted previously, the relevant portion of Article 2320 arguably imposes liability on teachers for the damage caused by their students while under their supervision. The plaintiff's argument for imposing vicarious liability on the School Board for the fault of H.B. apparently is based upon an interpretation of Article 2320 that would impose the same liability as that of teachers on school bus drivers in their capacities as employees of the School Board. We disagree.
>
> The starting point for the interpretation of any codal article is the language of the article itself. *See Burnette v. Stalder,* 00–2167 (La.6/29/01), 789 So.2d 573, 577. Generally, courts begin such an interpretation with the premise that legislation is the solemn expression

of legislative will, and that the interpretation of a law involves a search for the legislature's intent. LSA–C.C. art. 1; *Falgout v. Dealers Truck Equipment Co.,* 98–3150 (La.10/19/99), 748 So.2d 399, 401. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. LSA–C.C. art. 9. Moreover, the words of a law must be given their generally prevailing meaning. LSA–C.C. art. 11.

In light of these principles, we note that by its relevant terms, LSA–C.C. art. 2320 discusses the liability of teachers. Clearly, Ms. Hunt was employed as a bus driver and not as a teacher as that term is commonly understood. In addition, we note that *Vaughn*, *Doe*, and *Wallmuth* all involve incidents that occurred while the students were under the immediate supervision of teachers, not bus drivers. Accordingly, we find that the School Board is not vicariously liable for the fault of H.B. under the facts and circumstances of this case.

Like the first circuit case, the supervising employee in this case was not a teacher, but a bus driver. That status places the present matter outside of that addressed by the legislature in its clear, unambiguous use of the term "teacher" in crafting Article 2320. Simply, the inclusion of this non-teacher employee within the category defined by that specific term is contrary to the supreme court's directive to strictly construe vicarious liability provisions. Accordingly, I find that the trial court's shifting of the fault of the intentional tortfeasor student to the School Board pursuant to Article 2320 was in error.

Likewise, the majority, in my view, is in error in its application of Article 2320. For these reasons, I concur in part and dissent in part. Although I join in the majority's remand to the trial court with instructions to create a reversionary trust for the award of future medical treatment and to amend the judgment to reflect that those damages will not accrue judicial interest, I dissent from the remainder of the opinion. I would instead reverse the JNOV in its entirety upon a finding that the trial court erred in granting a JNOV as to damages as well as in its determination

regarding vicarious liability, and I would re-instate the jury's verdict.